AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Oregon

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The Cellular Telephone Assigned<br>Call Number 619-601-2595 and<br>IMEI: unknown | )<br>)   Case No.   '19-MC-299<br>)<br>)<br>) |

FILED 08 APR '19 10:33 USDC-ORP

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A hereto,

located in the _____ District of _____Oregon_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | Conspiracy to distribute the controlled substance (heroin), distribution and possession with the intent to distribute a controlled substance (heroin), and use of a communication facility to commit the offenses. |

The application is based on these facts:
See affidavit of HSI Special Agent Clinton Lindsly, which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 12/31/2019 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Clinton Lindsly, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____Telephone at 5:40 p.m._____ *(specify reliable electronic means)*.

Date: 04/03/2019

/s/ Stacie Beckerman
*Judge's signature*

City and state: Portland, Oregon        Hon. Stacie F. Beckerman, United States Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss:　　　AFFIDAVIT OF CLINTON LINDSLY

### Affidavit in Support of an Application for a Search Warrant for Geolocation Data

I, Clinton Lindsly, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I have been employed as a Special Agent (SA) by Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), since August of 2010. I am currently assigned to the ICE/HSI Office of the Assistant Special Agent in Charge, in Portland, Oregon narcotics unit. Previously, I was assigned to the ICE/HSI Office in Los Angeles, California, where I worked for over six years in a money laundering and narcotics group that specialized in undercover operations. My formal law enforcement training includes successfully completing the 23-week HSI basic training course at the Federal Law Enforcement Training Center in Glynco, Georgia. During the training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. Since then, I have participated in dozens of drug investigations which utilized wiretaps, controlled purchase operations, physical surveillance, trash searches, electronic vehicle tracking, pole cameras, cars with hidden compartments used to transport drugs, buy / walks, buy / busts, cell phone geo-location techniques, cell-site simulators, undercover operations including narcotics and money laundering, informants, search warrants, interviews, arrests, and/or pen register/trap and trace orders. I have interviewed and managed informants in drug cases, prepared and executed search warrants, arrested and interviewed suspects, conducted physical

surveillance, and operated/utilized electronic and video surveillance during my drug investigations. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking. In 2011, I was cross-designated with United States Code Title 21 Authority by the U.S. Drug Enforcement Administration to investigate narcotics cases. My most recent Title 21 authority update was on September 14, 2018.

3. I have participated in many aspects of drug investigations. I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am also familiar as to the manner in which narcotics traffickers transport and distribute narcotics in areas they control. I am familiar with how drug traffickers utilize counter-surveillance techniques to avoid detection by law enforcement. Additionally, I have also been involved in investigations involving wiretaps as part of federal investigations into narcotics trafficking.

4. I also know that drug traffickers often communicate with their drug-trafficking associates using cellular telephones. I have become aware that more sophisticated drug trafficking networks, in addition to using oral communications over cellar telephones, now utilize electronic communications such as email, WhatsApp, Blackberry devices or other smart phone devices, Voice over Internet Protocol, video chat, internet messaging services, and social networking sites to communicate with one another such as Facebook, Twitter, and Instagram. During drug-related communications, traffickers often use coded or cryptic language to disguise the drug-related nature of their conversations.

5. Based on my training and experience, I know that in many narcotic trafficking organizations, different factions of the organization are compartmentalized to protect the

organization as a whole. I know that the organizations' recruiters, transporters, distributors, customers, and money launderers often do not know each other. Limiting the access and knowledge of each participant serves to protect the organization if and when a participant is identified by law enforcement. I also know that narcotics distribution organizations compartmentalize the information available to any one member of the organization so that even if an arrested subject was fully forthcoming, interviews would only yield limited information as to the interviewee's limited knowledge of the organization.

6. I submit this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **619-601-2595**, with an unknown International Mobile Equipment Identity ("IMEI") number (hereinafter "**Target Cell Phone**"), whose wireless service provider is T-Mobile a company headquartered at 3625 132nd Ave SE, Bellevue, Washington, as described in Attachment A hereto. **Target Cell Phone** was activated on an unknown date, with an unknown subscriber, and is currently being used by a drug courier known as "BURRO." As explained below, I believe there is probable cause to obtain the location information as described in Attachment B hereto

7. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

Page 3 – Affidavit of Clinton Lindsly

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code Sections 841(a)(1), 843(b), and 846, have been committed, are being committed, and will be committed by "BURRO" and other co-conspirators both known and unknown who are yet to be identified, namely engagement in a conspiracy to distribute and possess with the intent to distribute a controlled substance, the distribution and possession with the intent to distribute a controlled substance, and the use of a communication facility to facilitate these felony drug offenses. There is also probable cause to believe that the location information of **Target Cell Phone** described in Attachment B, will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

## Applicable Law

9. Title 21 U.S.C. § 841(a)(1), provides that provides that it is a violation of federal law to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance, such as methamphetamine or heroin.

10. Title 21 U.S.C. § 846, provides that any person who attempts or conspires to commit any offense, such as those outlined in 21 U.S.C. § 841(a)(1), shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## SUMMARY OF INVESTIGATION AND USE OF COURT AUTHORIZED WIRETAPS

11. On March 20, 2019, Chief United States District Judge of Oregon, Honorable Michael W. Mosman, signed an order (19-MC-243) authorizing the lawful intercepts of wire and electronic communications related to drug trafficking to and from several Target Telephones (TT) used by members of the Ramon Manuel CISNEROS Drug Trafficking Organization

Page 4 – Affidavit of Clinton Lindsly

(DTO), including a prior phone used by CISNEROS, 971-288-3832 (TT1), a phone used by Edgar Omar QUIROZ Rodriguez, 971-291-8790 (TT2), and a phone used by Bryce Matthew HERSEL, 971-930-6132 (TT3). After authorization for interception it was learned that CISNEROS ceased using TT1, although individuals continued to call TT1. During these intercepts, Investigators have learned several things about the inner-workings of the CISNEROS DTO including how narcotics are potentially being transported to the District of Oregon, identified other co-conspirators, identified new drug stash locations, and identified additional phones being used to further the conspiracy including TT4, TT5, TT6, TT7, and TT8.

12.     During these intercepts, Investigators learned that CISNEROS stopped using TT1 approximately one day before intercepts because he was caught having an affair and a sex tape involving him was posted on social media. This information eventually led to the identification of CISNEROS via social media. Investigators have intercepted CISNEROS, communicating with TT2, using 619-552-6183 (CISNEROS' Former Phone #15), which wiretap calls confirmed that he later "lost," and TT4. This phone (TT4) was previously CISNEROS' Former Phone #14 and was used by CISNEROS to sell 225 grams of methamphetamine to CI2 on March 8, 2019. CISNEROS has used TT4 to talk and/or text message QUIROZ about coordinating the shipment of cars with hidden compartments via a tow truck, discussing drug deliveries, movements of drug couriers, and finding additional drug stash locations. QUIROZ and CISNEROS also discuss the wire transfer of money from the sale of drugs, facilitated by a money remitter identified as GONZALEZ, using TT7, believed to be the owner of GONZALEZ BROS. The wiretaps have allowed Investigators to learn that there are multiple "cells" within the CISNEROS DTO in Portland, Oregon. These cells are comprised of a local drug dispatcher, such as MARTINEZ, QUIROZ, and other unidentified co-conspirators, who control several drug couriers, such as

HERSEL, SALAZAR, SHAGGY, UHM-2, UHM-3, and MARKS. These drug cells are each responsible for delivering drugs to customers controlled by that particular cell. Each cell shares vehicles and drug stash locations. If one cell is out of a certain drug or unable to deliver the drugs quickly, QUIROZ and/or CISNEROS will have the other drug cell deliver the drugs. I believe this is done to further compartmentalize the CISNEROS DTO to avoid detection by law enforcement. It also serves to minimize significant losses if law enforcement does arrest a courier and/or execute search warrants at identified drug stash locations.

13. During the intercepts of TT2, as used by QUIROZ, Investigators learned that QUIROZ, who was in California when interceptions began, returned to Portland on March 29, 2019, to continue drug operations. Within hours of returning to Portland, QUIROZ was intercepted dispatching couriers to deliver large quantities of drugs to customers in amounts that indicate they were intended for further distribution. QUIROZ has been communicating with CISNEROS, using 619-552-6183 (CISNEROS' Former Phone #15) and TT4, about coordinating the transportation of cars with hidden compartments, the transportation and wire remittal of drug cash, courier drug delivery times, and securing new drug stash locations. CISNEROS and QUIROZ have had long discussions about drug courier problems in Portland, firing current drug couriers, and sending new co-conspirators to Portland to continue drug operations. QUIROZ has also been intercepted discussing the installation of hidden compartments in cars with TRINIDAD, and frequently communicates with MARKS, using TT5, and SALAZAR, using TT6, about drug deliveries, drug quantities on hand, and renting new drug stash locations. Investigators also learned that QUIROZ and CISNEROS use GONZALEZ to wire transfer drug cash to Mexico using straw names.

14. During the intercepts of TT3, as used by HERSEL, Investigators learned that HERSEL was initially not delivering drugs for CISNEROS due to his pending state case but was recently given the approval to start selling cocaine. HERSEL was intercepted relaying drug customer information by voice and text message, such as providing SUITER's address and other drug customer locations, to MARKS using TT5, and communicating with drug customers, such as BARRERA and BRUCE, about ordering drugs. Investigators also learned that HERSEL possesses numerous firearms and was called by CISNEROS to "beat up" MARTINEZ for selling another source of supply's drugs. CISNEROS eventually cancelled this threat to harm MARTINEZ.

15. Investigators also learned that SALAZAR uses another phone in addition to TT6 to conduct drug operations. On March 26, 2019, SALAZAR used TT8 to sell approximately 232 grams of methamphetamine and 27 grams of heroin to a Confidential Informant (CI2). This drug deal was done under the direction and surveillance of law enforcement and CI2 is working in hopes of sentencing considerations in a pending matter. Investigators believe that SALAZAR uses multiple phones to compartmentalize her drug trafficking activities and avoid detection by law enforcement.

16. Investigators have also learned that the CISNEROS DTO is extremely cognizant of law enforcement, often vacating drug stash locations, searching their vehicles for GPS tracking devices, or rotating cars at the sign of any police activity. During surveillance of SALAZAR on March 28, 2019, Investigators were detected. Specifically, SALAZAR described in detail four of the five undercover police cars that were following her and later boasted on intercepted calls with QUIROZ, using TT2, that she took the Investigators all over Portland. During this surveillance, SALAZAR also called her boyfriend in jail. According to the recorded

jail calls, SALAZAR laughed as she told her boyfriend that she led Investigators to innocuous locations and at one point screamed out loud as she stared at one of the suspected police cars. Since then the CISNEROS DTO has been extremely sensitive to any police activity, any marked police cars, or many other cars that have nothing to do with police activity. In one instance, Investigators had to contact local police to move a marked unit that was parked near SALAZAR's residence for reasons unrelated to this investigation. During intercepted calls, SALAZAR told QUIROZ, using TT2, that police were getting ready for a search warrant on her residence. Despite this, QUIROZ, using TT2, continues to sell large quantities of drugs.

### CISNEROS DIRECTS QUIROZ TO PICK UP DRUG LOAD

17. On April 2, 2019, at approximately 5:19 p.m., QUIROZ, using TT2, called CISNEROS, using phone number 619-552-6183 (CISNEROS' Phone). The call was conducted in the Spanish language and translated by monitors who are fluent in the Spanish language. During the intercepted call and among other things, CISNEROS asked QUIROZ how much money there was on hand. QUIROZ told CISNEROS that there was "27." CISNEROS told QUIROZ that "they" would go pick up "food, water, and aparatos" at the hotel. CISNEROS told QUIROZ that he would send him (QUIROZ) the "number" of the "guy" to get the "Morena," and to take "20." CISNEROS told QUIROZ he was not sure how many the "supplier" would give him.

18. Based off this call, I believe that CISNEROS directed QUIROZ to go pick up heroin. Specifically, CISNEROS asked QUIROZ how much money there was on hand. QUIROZ told CISNEROS that there was $27,000 in drug cash. CISNEROS told QUIROZ that they would pick up pounds of heroin from one hotel and kilograms of methamphetamine at another hotel. CISNEROS told QUIROZ that he would send him (QUIROZ) the phone number

Page 8 – Affidavit of Clinton Lindsly

of the drug courier to get the heroin and that it will cost $20,000. CISNEROS told QUIROZ that he was not sure how many pounds of heroin the drug supplier would give him (QUIROZ).

19. At approximately 6:09 p.m., CISNEROS, using CISNEROS' Phone, called QUIROZ, using TT2. The call was conducted in the Spanish language and translated by monitors who are fluent in the Spanish language. During the intercepted call, CISNEROS told QUIROZ that it would be a total of "four" to be picked up. CISNEROS told QUIROZ that he (QUIROZ) was to take "1.5" to the "house" in order to "work on it."

20. Based off this call, I believe that CISNEROS told QUIROZ that there would be four pounds of heroin to be picked up at the hotel. CISNEROS told QUIROZ that he (QUIROZ) was to take one and a half pounds of heroin out of the four pounds purchased to the drug stash location in order to cut the drugs, or increase the yield of the drug by mixing additives.

21. At approximately 6:46 p.m., QUIROZ, using TT2, called BURRO, using **Target Cell Phone**. The call was conducted in the Spanish language and translated by monitors who are fluent in the Spanish language. During the intercepted call, QUIROZ told BURRO that the "guy" had told him to call. BURRO told QUIROZ that he was "ready." QUIROZ asked BURRO if they could have an hour because the "guys were busy," to which BURRO agreed. QUIROZ told BURRO that he had counted the money and when ready "they" would contact him (BURRO).

22. Based off this call, I believe that QUIROZ told BURRO that CISNEROS told him (QUIROZ) to call about the drug purchase. BURRO told QUIROZ that he was ready to sell the heroin. QUIROZ asked BURRO if they could have an hour because all the drug couriers

(SALAZAR and SHAGGY) were busy selling drugs. QUIROZ told BURRO that he had counted the money and when ready SALAZAR would contact him to purchase the drugs.

23. At approximately 6:53 p.m., QUIROZ, using TT2, called SALAZAR, using 503-310-4108 (SALAZAR's Phone). The call was conducted in the Spanish language and translated by monitors who are fluent in the Spanish language. During the intercepted call, QUIROZ told SALAZAR to pick up "20,000 dollars" and take it to "Paisano" who was at the hotel. SALAZAR asked QUIROZ what hotel. QUIROZ told SALAZAR to hold on (QUIROZ put SALAZAR on hold and answered the below call).

24. Based off this call, I believe that QUIROZ told SALAZAR to pick up $20,000 in drug cash and take it to BURRO who was at the hotel. SALAZAR asked what hotel and was put on hold by QUIROZ.

25. At approximately 6:53 p.m., BURRO, using **Target Cell Phone**, called QUIROZ, using TT2. The call was conducted in the Spanish language and translated by monitors who are fluent in the Spanish language. During the intercepted call, BURRO said he was getting ready to go over "there." QUIROZ told BURRO he was about to send the "girl." BURRO told QUIROZ that he was at "six of Stark and 205th." QUIROZ told BURRO that a "girl" would call him shortly in order to meet, to which BURRO acknowledged.

26. Based off this call, I believe that BURRO told QUIROZ that he was getting ready to go back to the hotel to complete the drug deal. QUIROZ told BURRO that he was about to send the "girl" (SALAZAR) to retrieve the drugs and that she (SALAZAR) would call.

27. At approximately 6:59 p.m., QUIROZ, using TT2, sent a text message to SALAZAR, using SALAZAR's Phone. The intercepted text message read "619 601 2595," which was immediately followed up with another outbound text to SALAZAR that read

Page 10 – Affidavit of Clinton Lindsly

"Paisano." Based off these text messages, I believe that QUIROZ sent BURRO's contact information to SALAZAR to coordinate the purchase of four pounds of heroin.

28. During the above intercepted calls and/or text messages, Investigators were surveilling SALAZAR, who was driving a black Ford Ranger bearing Oregon license plate #153KPG (Ranger).

29. At approximately 8:00 p.m., Investigators followed SALAZAR to Motel 6 located at 9225 SE Stark St, Portland, OR 97216. This was the address which Investigators believe was relayed by BURRO to QUIROZ for the drug delivery. Specifically, BURRO told QUIROZ "Six at Stark and 205th" and the motel that Investigators followed SALAZAR to was located at Stark and the 205 freeway. SALAZAR then parked the Ranger underneath room number 234 or 235. Investigators observed SALAZAR meet with an unidentified Hispanic male outside of room 235, who then appeared to walk away from SALAZAR with something in his hand. Based off this observation and the wiretap calls, Investigators believe that SALAZAR gave the unidentified Hispanic male (BURRO) $20,000 to purchase four pounds of heroin. Eventually, SALAZAR went into room 235 with BURRO.

30. At approximately 8:40 p.m., SALAZAR and BURRO exited the hotel room and walked to the Ranger. SALAZAR got into the Ranger and appeared to engage in conversation with BURRO.

31. At approximately 8:45 p.m., SALAZAR drove away in the Ranger. Investigators believe that SALAZAR purchased four pounds of heroin from BURRO for $20,000. I also know that, in the greater Portland, Oregon area, four pounds of heroin is a large amount and that an individual selling four pounds of heroin does not do it as a one-time event, but rather this is indicative of someone who is engaged in an ongoing commercial drug trafficking enterprise.

32. Based off the above intercepted calls involving QUIROZ, using TT2, SALAZAR, using SALAZAR's Phone, and BURRO, using the **Target Cell Phone**, the observation of a suspected drug delivery by BURRO, and my knowledge of this investigation, I believe that there is probable cause to believe that the **Target Cell Phone** is being used to coordinate the delivery of large quantities of drugs in violation of Title 21, United States Code Sections 841(a)(1), 843(b), and 846. I also have probable cause to believe that the location information of **Target Cell Phone** described in Attachment B, will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

33. In my training and experience, I have learned that Provider is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

34. Based on my training and experience, I know that Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Provider's network or with such other reference points as may be reasonably available.

35. Based on my training and experience, I know that Provider can collect cell-site data about **Target Cell Phone**.

### Conclusion

36. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Cell Phone** outside of daytime hours.

37. I further request that the Court direct Provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Provider. I also request that the Court direct Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of **Target Cell Phone** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

38. Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States

Page 13 – Affidavit of Clinton Lindsly

Attorney Scott Kerin. I was informed that it is AUSA Kerin's opinion that the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

### Request for Delaying Notice

39.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Based upon my knowledge, training, and experience, it is my belief that providing immediate notice to subscriber or user of the Target Cell Phone may result in the endangerment of the life or physical safety of an individual, flight from prosecution, the destruction of or tampering with evidence, intimidation of potential witnesses, and/or otherwise seriously jeopardize an investigation. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

///

///

### Request for Sealing

Page 14 – Affidavit of Clinton Lindsly

40. I further request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search warrant, including the application, this affidavit, the attachments, and the requested search warrant. I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may endanger the life or physical safety of an individual, cause flight from prosecution, cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise seriously jeopardize an investigation. Premature disclosure of the contents of the application, this affidavit, the attachments, and the requested search warrant may adversely affect the integrity of the investigation.

Sworn at 5:40 p.m. on 4/3/2019

Clinton Lindsly
Special Agent
Homeland Security Investigations

Subscribed and sworn to me telephonically, in accordance with the requirements of Fed. R. Crim. P. 4.1, this 3rd day of April 2019.

Honorable Stacie F. Beckerman
United States Magistrate Judge

Page 15 – Affidavit of Clinton Lindsly

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number 619-601-2595, with an unknown International Mobile Equipment Identity ("IMEI") number (hereinafter "**Target Cell Phone**"), whose wireless service provider is T-Mobile a company headquartered at 3625 132nd Ave SE, Bellevue, WA 98006.

2. Information about the location of the **Target Cell Phone** that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to Be Seized

All information about the location of the **Target Cell Phone** described in Attachment A for a period of thirty days, during all times of day and night, and the status of the device and the account associated with the device (i.e., whether the device is active or operational and whether the account is in good standing, canceled, suspended, etc.). "Information about the location of the **Target Cell Phone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile (referred to hereinafter as "Provider"), Provider is required to disclose the Location Information to the government. In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

/ / / /

/ / / /

**Attachment B**

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**Attachment B**